Good morning, your honors. May you please the court. I am Mark John Doe, and I represent the plaintiffs in this matter, and I reserve two minutes for rebuttal. In this case, or this appeal, I should say, we are seeking reversal of the District Court's July 5, 2003 decision denying plaintiffs' motion for leave to amend our complaint for three main reasons. The first is the District Court failed to construe the first amendment complaint, or the proposed first amendment complaint, liberally to accept all factual allegations as true in drawing reasonable references for plaintiffs. Secondly, the District Court failed to consider the considerable circumstantial evidence that we had pled that showed that the defendants had breached their fiduciary duties as required by the holistic approach endorsed by the Second Circuit in Cesar Dorte v. New York University. And thirdly, the District Court erred in finding that the plaintiffs failed to plead information as to the type and quality of services of record-keeping. Could you just elaborate for us, what does the complaint actually allege about the actual services rendered? Because I'm struggling with your adversary's point that to plausibly plead a claim like this, you really need to say something specific beyond similar plans, offer the same services, and all services are of the same quality, and you can get them breached for price. Of course, Your Honor, and this has been a sticking point, not only in this case but in other cases, and certain courts have found in our favor. The first thing that I think needs to be recognized in this context, the types of services that my adversary speaks of are the record-keeping services that these record-keepers have engaged with these sponsors. And these are documents that spell out exactly what services the record-keepers are going to provide. It should be known, and I think is generally acknowledged, that these record-keeping services are not available in the public sphere. They're closely guarded by the record-keepers. They don't want them in the public domain. So for plaintiffs in an arrestor case, in order to plead plausible record-keeping services, we have led circumstantial evidence. One of those evidence, one such evidence is looking at the Form 5500, which has codes for the record-keeping services that are being performed for a plan. But these codes are very general. All it says is record-keeping services or something similar to that. So it doesn't get to the level of detail that my adversary says we need to get to. And in fact, there is no case where any other plaintiff has actually attached the actual record-keeping service and explain what they do. So one way to plead a plausible record-keeping services claim is to show that, first of all, the Form 5500 has these codes that show that they're paying record-keeping services, and these codes are similar in other plans we compare it to. Another way to show that, to sort of plead the plausibility of services and the quality of it, is to show is what we have done here. We allege, as plaintiffs in other cases have done, that these record-keeping services are provided by some of the top record-keepers in the country that are capable of, that give the same type of record-keeping services to everyone. The record-keeper here was Vanguard, as we allege in our complaint. In 2020, Vanguard Can I just ask you, doesn't there seem to be a contradiction in your argument where you say, well, look, I can't tell you what record-keeping services are provided in this plan, right? Because we don't know. They're a secret, right? That's part of your argument. I can't get more detailed because they don't reveal it, right? Hang on. Then how can you also claim not to know what they're providing? Yet, how can you say that, oh, well, but it's all the same because you've just told us I don't know what they provide. How do you get around that contradiction? Is that actually a contradiction? I don't know what the provider was actually addressing what my adversary says, but it doesn't matter because they all provide the same type of services. I guess my point is, how do you know that they provide the same type of services if you don't even know the types of services provided in this case? Well, we know the general type of services provided because it's just from the 5500 codes. But it just said, I thought the 5500 codes you said are so generic as to tell you virtually nothing. Well, they're generic in the sense that they don't get into details, but these are fungible services, so any addition or subtraction are quite minor, and that's how you would allege it. What do you mean by that? You say that in the complaint, but what does that mean that they're fungible? Fungible means you can exchange one for the other and it doesn't matter, right? Exactly. So how is it fungible, for example, you have a list, I think it's on page, I'm looking at paragraph 68, I think it's the appendix 105, multi-channel participant and plan sponsor access, for example, phone and web. And then you have another one, participant tax reporting services, for example, IRS Form 1099-R. You're not suggesting that phone and web access for participants is fungible with tax reporting, are you? No, what I'm suggesting is... So what's fungible with what? All the services provided here are all the same services provided to generally all plans. These record keepers have the infrastructure that's already built into their system. That's not fungible. Well, in this context... Fungible means you can, like I give you two dollars in two single dollar bills and you give me eight quarters, that's fungible, that's the same thing. Well, in this context... What do you mean by fungible here, because I don't think... So from plan to plan, the different call center will be the same for another plan. So this is where I'm coming back to my original question, is if you're telling us you don't know what kinds of 1099 services are being provided by plan A, and you don't know what kind of 1099 services are being provided by plan B, how can you tell us that you've alleged that they're basically the same? Well, I'm telling you that the prices are the same, because that's... That the what have specific... We can't because... Right, so how can you tell us that they're basically the same, if you don't know what they are? Well, we know it from the circumstance, the other evidence that these record keepers are providing the services to the plan based on their sizes. So the type of services we've listed are generally provided. Let me see if I understand. You've listed a whole bunch of things, services that are offered. You don't know in a particular case whether there's uptake by a particular comparator plan. But are you saying, and I agree that fungible is kind of a... Maybe let's put the word fungible aside for a minute. The allegation these services are offered by all record keepers for one price, typically at a per capita price, regardless of the services chosen or utilized by the plan. So in other words, are you... Am I understanding that that's your answer, that you're... It doesn't matter whether you know which specific ones a user uses, because they don't affect the price typically. That's exactly right. And what you have to look at is the number of participants in the plan, because that's really what drives the price. So you can talk all day about services, but the price is going to be relatively the same, based on the number of participants. Here you have 80,000 participants, which will drive down the price of the... And why does that... It's interesting, because in the allegations, the cost is sort of the same once you have the infrastructure. Does the number of participants drive the price down just because of the market power involved in those negotiations? That's exactly right. So the larger the plan, the more you could drive down your cost. And here there are additional reasons why the Deloitte plan could have driven down cost. There was another plan that Vanguard record kept, which is another way they could leverage their relationship with Vanguard to get lower prices. Can I ask you, because I'm mindful of time, there's sort of two apples-to-apples conversations here, and the one that we've been having is the bundle of services conversation. But there's a second apples-to-apples conversation, which is cost. And in your initial complaint, you had direct and indirect costs for the plan that you're challenging. But for the comparators, you only had the direct costs. And of course, well, that's not apples-to-apples. The fix in your amended complaint has been to take out the indirect costs as part of the comparisons. You're comparing direct costs to direct costs, but as I understand it, direct costs doesn't really tell us anything relative to the total costs unless we also know the indirect costs. So how do we, even if it's apples-to-apples, are they relevant apples? Yeah, well, I mean, I think by taking the direct costs, it actually should be favorable to Deloitte, because here, if you look at 2019, for instance, when we look at the direct costs, it was actually almost the same as the direct costs plus the indirect costs. But we don't know with these comparators. So for instance, you might have a comparator that looks very much less cost on the direct cost metric. But if they do a lot of revenue sharing and they get their record keeping payments that way, then in fact, they might be more costly. And so is there some sort of industry standard as to the proportion of the direct to the indirect that gives us assurance that the direct cost is a helpful figure? Well, there is no exact industry standard. And that's why in our initial complaint, I mean, what you have to do is look at the indirect costs are based on the funds in the plan and how much revenue sharing they're paid. But from the pleadings level, at a submission to dismiss stage, that's all the information you have. So you don't have the information. And I'm just trying to figure out, so in this Third Circuit case that you all shared with us, and there's a lot of discussion about the bundle to bundle question. That's right. But I was struck that the plaintiffs in that case had taken their best shot at trying to estimate the indirect costs associated with the comparator plans by looking at the funds offered in the plans. And I think everybody recognized it was their best shot estimate. And the court said that that was enough to pass muster. But here, what I understand you to be saying is we can't do that. Well, we did that in our first complaint. And the district court said it wasn't good enough. As to the comparators? Yeah. That's right. It said no, it's not good enough. So that's why for the second amendment complaint, we tried to just limit it to direct costs, which there's no argument as to that. So we've done, we did exactly what the plaintiffs in Mader have done, what the plaintiffs in Hughes v. Northwestern did, what the plaintiffs in Perkins v. United Surgical did. I was counsel on Perkins v. United Surgical. Very similar allegations. And I know my time's up, but the point, I think the general point is here, as the Eighth Circuit said in Braden, on these types of cases, there's a lot of information that the plaintiffs don't have. And the court has to be liberal in allowing them to plead their case. Here, defendants have also given you counter facts, but that's not the, they'll be fine on summary judgment. But on the pleading stage, I think there may be alternative reasons why they did something, but it can't outweigh what plaintiffs themselves have pled in the complaint. And I believe we've stated that in our papers and the recent decisions in the Third Circuit and the Fifth Circuit support that. And we believe the Sarcedote case also supports it in terms of the holistic approach to reviewing these pleadings. Thank you. I know my time's up. You deserve some rebuttal time. Okay. All right. Thank you. Good morning, Your Honors. May it please the court, my name is Michael Keneally and I record-keeping services than the Deloitte plan. But their allegations in this particular case are nowhere near enough to state a claim for breach of fiduciary duty under that theory. Plaintiffs haven't used the disclosures and information available to them to ensure that they are truly comparing apples to apples when they compare the Deloitte plan's alleged fees for record-keeping to those of other plans. As many courts have recognized, ERISA plans can reasonably decide to pay more money for more services. But plaintiff's complaint says virtually nothing about the services actually provided to the Deloitte plan. But they've alleged that in the real world within the universe of the plans that we're looking at, there isn't price sensitivity as to the bundle of services provided. This doesn't significantly affect the price. Isn't that essentially what the Seventh Circuit said, yeah, that's enough in the Hughes case, in the second round of the Hughes case? And isn't that right? Well, I think it's important to look at what it specifically alleged about the costs of services and what the quality or quantity of those services will mean for the costs. Because in paragraph 69 of their complaint, they distinguish between the sort of standardized bundle, things that appear in 68, but they also identify some additional types of services that record-keepers may provide, like participant loans, self-directed brokerage accounts, which they call ancillary services that are usually charged only to the participants who use them. And I think that's really important here, because when we look at those Form 5500s that my friend on the other side was talking about, the one code that's listed there that's very important for the Vanguard services provided to Deloitte, but are not, that's not actually found on all but one of their comparators, is the code for investment advice, and that's code number 26. And I think that's important because in addition to those Form 5500s, we also have, and plaintiffs relied on in forming the allegations of their complaint, the fee disclosures, the 40485 disclosures. And they talk about these individual transaction services, including loan processing, and in this plan, the Vanguard managed account program fees. So this case actually resembles closely the Matusik versus MidAmerican Energy case from the Eighth Circuit, where the reason why there was such a discrepancy between the numbers that the defendants put forward for record-keeping fees, in our case, $22 to $40, and the numbers that the plaintiffs estimated by looking at the Form 5500, in this case, $46 to $68, is because there were actually additional fees that don't get counted as standard record-keeping fees, like these investment advice programs, that are being included in the 5500 direct compensation because they're going to Vanguard. Vanguard's the provider of those services, but they're not included in the amount of record-keeping itself. So that's why I think that one allegation that plaintiffs make, that services don't really matter, isn't a believable allegation. If you look at the entire universe of information and disclosures that are available to participants about this plan. And I think that's why... We're on a motion to dismiss, not summary judgment. Some of these are going to be factual arguments about what the codes are going to mean, and how do they get applied, and how much discretion is involved in how you code something, versus what you're actually delivering. All of those feel like fact questions that would be inappropriate for us to sort through in a motion to dismiss. And even the codes, the complaint on its face doesn't purport to sort of parse what each code means. It parses a general set of services that it says are generally available, regardless of whether they're taken up. So even if there's extra codes in there because they're taking up services, they've said, yeah, but that's not really going to affect the price. Now you may have a great answer to that that's developed through facts and summary judgment, but if this complaint... Let me ask this one. How could absent discovery... Is it possible for a plaintiff to put together a case based on comparators, based on publicly available information? What could they be doing that they're not doing here based on publicly available information? Well, I think Mr. Django's answer to Your Honor's question about how do we even know if you can't have... If you don't have access to the information, how can we even know that the services are comparable? His answer was the Form 5500 codes, as I understood his answer, at least. And if the Form 5500 codes don't actually match up, then I think we have a big problem, because then we don't have any basis to know that we're And so in this case, perhaps finding comparators that actually used the same codes, that had a similar managed account option, that might help. I mean, it would certainly be better than what we have here. But then we'd still have the second apples-to-apples problem, which I think is really important here and maybe the narrowest way to resolve this case, because contrary to what Plaintiff's Counsel said, there was never any allegation here about the total amount of fees, indirect and direct, that the comparators were paying. And in our Supplemental Appendix, page 22 in Note 12, we go through each of the seven. There were originally seven comparators. Each of the seven explained that they have indirect fees reported on their 5500, but we don't know the amount, and so we don't know the total. And so if you're comparing a portion of the costs paid by the Deloitte plan to a portion of the costs paid by the other plan, you don't know whether the total costs of the Deloitte plan are actually higher, even. Right, which is, I think, why what the Plaintiff did in the Wesco case seems less concerning relative to that apples-to-apples, but I'm guessing you're going to argue that it's too speculative, because they're necessarily making estimates of the indirect costs associated with the other plans based on the funds offered within those plans, right? Am I misunderstanding how that would work, or how that works? So how it normally works, Your Honor, is that plaintiffs will look at the prospectuses for different funds, figure out what share classes are available, figure out the difference in fees of the different share classes, and kind of make an informed guess about how much of that costs were actually higher than the other plans. And so if that's true, not having this indirect fees element in the complaint for the comparators is really a problem. And in Wesco, there were 16 comparator plans. This problem of not including indirect compensation only applied to two of those 16. And the Third Circuit said, well, we can pretty much be sure that those two- So in the other 14, they had non-estimated information on the indirect costs, or they had gone through this process you just described of looking at the prospectuses and- If I'm remembering correctly, it was this process, where you estimate it from, and that's how usually they estimate for the plan that they're challenging as well. You can look at, there is public information out there. There's information about what funds are available, what their investment objectives are, what their fee structures are in the fund prospectuses. There are the Form 5500s for both the defendant's plan and for every plan, including the ones that could be potential comparators. And there are fee disclosure requirements per Department of Labor regulations that go out to the individual participants in a plan. And here, in this case, they relied on those fee disclosures. And in the Third Circuit case, the Third Circuit said that those are part of what the court can consider on a motion to dismiss. So I agree that it can be challenging to come up with an explanation for a fiduciary breach based purely on facts about the sticker price of different services or options to invest in. But there are ways to do it, and I think part of the reason why we see different outcomes in different cases is that the complaints stack up differently. So we're not saying it's impossible, and we're not saying that the pleading standard is insurmountable. But here, where you have, from the publicly available information, overstatement of the defendant's plan's fees and understatement of the comparator's plan's fees, you really don't have any basis to draw, even under the most liberal pleading standards, the conclusion that the plaintiff, that the defendant's recordkeeping fees are evidence of a fiduciary breach. And I think if this court were to find that on these allegations, it would be hard for me to imagine a case where a plaintiff couldn't come up with some interpretation of the plan's disclosures and some interpretation of other plans' disclosures that allow them to tell a story that the plan's fees were too high for some reason than the comparator's fees, enough to go past a motion to dismiss. If in the real world, like I understand conceptually why it's really important to make sure you have apples to apples. If in the real world, they are apples, right? You've got your ten companies that they've said, okay, they provide comparable quality services, and they provide this bundle, and they don't really vary their prices based on the uptake within that bundle. If that's the reality, then why wouldn't alleging that, I mean, you may be able to disprove that, but I'm just trying to figure out why that's not a sufficient allegation to sort of wash out some of the complaint level, I don't want to say nitpicking, I don't mean that in a derisive way, but like, wait a minute, this number doesn't correspond to this number, and maybe they're getting a different service. Yeah, and I totally understand that impulse, because it's the same impulse that this court addressed in the St. Vincent case when it said you don't need to have direct allegations about the process that the fiduciaries used, and how that process fell short, because you don't have access to that information. So what we're going to do is we're going to allow you to raise a plausible inference about a deficient fiduciary process through circumstantial allegations about the results of that process. So we're already in the circumstantial allegations sort of pleading environment making an accommodation for the lack of information that participants have. But also, that is at the same time counterbalanced with the concern that these cases can involve extreme discovery costs that are asymmetrical, and that provides a strong incentive to settle, even if you could put on a defense, it would be costly to do so. Well, how would you distinguish the cases that have gone past the pleading stage, and there have been some Perkins use, how would you distinguish those complaints from this one? So every case is kind of taken on its own. Perkins had a combination of claims that I think showed the concern I was mentioning before. The uncapped revenue sharing was evident in the inclusion of institutional class, or excuse me, of retail class investment options. And when you take an allegation like that, you're including an option that's indistinguishable from an alternative, except it's more expensive. And then you add that to the allegation that you're paying too much anyway for all of those records keeping services. Then you have a combination of allegations that taken as a whole may raise more of an inference about a deficient fiduciary process. In Hughes, there were two record keepers, and the 7th Circuit earlier would have led to a reduction in fees. The court's analysis about the adequacy of the allegations as to comparability of record keeping fees didn't actually turn on that. That was an important part of the ultimate holding, but the discussion that says yes, this allegation that they're essentially the same in terms of the quality of service and things like that was enough, wasn't it? Well, respectfully, I disagree a little bit, because the way that the 7th Circuit distinguished its earlier decision in Albert v. Oshkosh, which had very similar allegations to what I had here, it's one of the cases that actually did have a list of comparator plans and say, they paid this much, you paid higher, so there's evidence there. The way that the Hughes court distinguished that case was by highlighting this multiple record keepers point. And I forget the exact citation, but I think we cited it in our brief. And then the Maytor case, I would just also quickly distinguish, because I think there, in addition to some of the points we've already talked about, uncapped revenue sharing concerns, the discrepancy between the amounts of the comparators and the amounts of the plan was a difference of about $100, and that's far greater than the difference we have here, in addition to the other differences that we highlighted in our letter. I'm happy to answer other questions that your honors may have. I am out of time. If there are none, we would ask that judgment be affirmed. Thank you. We'll hear rebuttal. I'll be very brief. Just two main points. The first is to address the nature, going back to the form 5500s, because that seems to be a point of contention. In the Maytor v. Wesco case, this exact issue came up where plaintiffs had derived numbers from the form 5500. Defendants said they included everything in it. It's not the same. The court says, just to quote, I'm looking now at Asterix 10 on the Westall version. It says, but the plans from 5500s seem to say otherwise. Each year the plan reported paying hundreds of dollars more likely than the allegations of misconduct. The point there is, at this stage, there's going to be discrepancies between what defendants say and plaintiffs say. There always will be. We do the best we can by looking at the form 5500s to derive a plausible complaint. The second and last point I want to make is, my adversary and other adversaries in this space contort themselves to distinguish the cases that have gone beyond the motion to dismiss to see how it's different from our case. It's the same thing. The point is, the cases that have gone past the motion to dismiss have not just relied on one factor, but several. That's what we do here. Not just comparing to other plans. We compare it to any of the record keeping surveys. We make inferences from the size of Vanguard being one of the top record keepers. We cite Fidelity's pricing. The comparators are based on plans that are record kept by Vanguard and Fidelity. Looking at it in total, we believe that's what the other courts which have allowed claims to go forward have done. We suggest that's what should be done here. Thank you for your time, Your Honors. Thank you both and we'll take the matter under advisement.